**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RYTA CHANTHAVONG and** | : | **No. 3:13cv2666** |
| **BRIAN CHANTHAVONG as legal** | : | |
| **guardians of D.D.C., a minor,** | : | **(Judge Munley)** |
| | : | |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| **UNION SECURITY INSURANCE** | : | |
| **COMPANY d/b/a ASSURANT EMPLOYEE** | : | |
| **BENEFITS,** | : | |
| | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court for disposition are cross motions for summary judgment filed by both the defendant (Doc. 18) and plaintiffs (Doc. 16). These motions are fully briefed and ripe for disposition.  For the reasons stated below, the court will deny defendant's motion and grant summary judgment in favor of the plaintiffs.

## Background

The instant case presents a dispute over the interpretation of a life insurance policy with an accidental death benefit.  Specifically, the parties disagree as to whether a policy exclusion, providing that no benefit will be

paid when an accidental death[1] is caused, directly or indirectly, by a
disease, applies.

Cory D. Carter died on April 14, 2012, accidentally drowning in his
bathtub.  (Compl. ¶ 11).  The insurance company, Defendant Union
Security Insurance (hereinafter "defendant"), denied the plaintiffs' request
for the accidental death benefit.  Defendant maintains that Carter's death
was caused in part, indirectly or directly, by a seizure disorder, which
renders the benefit unpayable.  Plaintiffs[2] argue that defendant's denial
was based upon an incorrect interpretation of the policy, and that
defendant's finding that Carter had a seizure was unsubstantiated.

### A. The Policy

Carter was insured under a group life insurance policy established by
his employer, Scranton Dunlop, Inc., which did business as Sandone Tire
and Battery, Inc.  (Doc 1, Compl. ¶¶ 5, 8).  Carter listed his minor son,

---

[1]  The accidental death and dismemberment policy states, in relevant
part, "We will not pay benefits if the loss results directly or indirectly from
. . . any physical disease, or directly from any mental disease."  The term
"loss" is not defined.

[2]  On February 4, 2013, the Lackawanna Court of Common Pleas
appointed Carter's companion, Ryta Chanthavong, and her brother, Brian
Chanthavong, as legal guardians of D.D.C., who was two years old at the
time.  (Doc. 18-3, Guardianship Order dated 2/14/13 at 219).

Plaintiff D.D.C., as the policy's beneficiary in the event of Carter's death. (Id. ¶ 8).

The policy, number G 5457895, which includes a general life insurance benefit as well as accidental death coverage, states that Pennsylvania law governs its interpretation.  (Doc. 18-3, Group Insurance Policy at 2).  The policy contains an "Exclusions" provision stating that defendant "will not pay [accidental death] benefits if the loss results directly or indirectly from . . . any physical disease . . . ."  (Id. at 26).  The accidental death life insurance group plan at issue is established and maintained as an employee benefit plan, and as such is subject to the provisions of the Employee Retirement Income Security Act of 1973 (hereinafter "ERISA"), 29 U.S.C. § 1001, et seq.  Pursuant to § 502(a) of ERISA, 20 U.S.C. § 1132, a beneficiary of an employee plan may bring a civil action to recover benefits due him under the terms of the plan.

### B. The Claims Process

In the wake of Carter's death, the plaintiffs filed claims for benefits under the general life insurance and accidental death insurance provisions of the policy, each of which provided for payouts of $100,000.  Defendant paid the $100,000 general life insurance proceeds (plus $1 in interest) into

an account for the benefit of Plaintiff D.D.C. on May 25, 2012.  (Doc. 18-3, Assurant Letter dated 5/25/12 at 83).  Defendant denied the accidental death claim on October 23, 2012, asserting that Carter's seizure disorder triggered the physical disease exclusion under the accidental death policy. (Doc. 18-3, Assurant Letter dated 10/23/12 at 145).

Through counsel, plaintiff invoked defendant's internal appeal process on December 13, 2012.  Plaintiff argued that the accidental death benefit should be paid because Carter's death was caused by drowning, cardio-pulmonary arrest, and respiratory failure.  (Doc. 18-3, Plaintiff Appeal Letter dated 12/13/12 at 156-57).  In denying plaintiffs' appeal, defendant acknowledged the accidental nature of Carter's death, but stated that because a seizure caused the drowning, the physical disease exclusion applied, precluding payment of the accidental death benefit. (Doc. 18-3, Assurant Letter dated 1/22/13 at 208-209).

Plaintiffs indicated they would further appeal on January 30, 2013. (Doc. 18-3, Plaintiffs' Appeal Letter at 215).  After an internal committee reviewed the case file, defendant again denied plaintiffs' appeal, finding that Carter's seizure disorder indirectly caused his death.  (Doc. 18-3, Assurant Letter dated 4/15/13 at 229).

4

### C. Medical Evidence

Lackawanna County Coroner Timothy Rowland issued a certificate of death that listed cause of death as drowning and seizure disorder, and manner of death as accidental.  (See Doc. 18-3, Clinical Services Assessment at 86; Doc. 18-4, Coroner Summary Report at 149).  Gary W. Ross, M.D., a forensic pathologist at Forensic Associates of NEPA, performed an autopsy on April 16, 2012.  (Doc. 18-3, Dr. Gary Ross Autopsy at 160-171).  In a report dated June 18, 2012, Dr. Ross noted Carter's history of seizure disorder, and found no evidence of external traumatic injury.  (Id.)  The lungs were reportedly wet and heavy, and Dr. Ross found a bloody froth in the bronchi and trachea.  (Id.)  Carter had a blood/alcohol level of .035 at death, and evidence of marijuana use was found.  (Id.)  Dr. Ross listed the cause of death as "[d]rowning due to seizure disorder," and manner of death was "accidental."  (Id.)

On June 29, 2012, after plaintiffs submitted their initial claim, pathologist Allen J. Parmet, M.D., at the defendant's behest, reviewed available documents (which did not include any of Carter's medical records (see Doc. 18-4 at 73-74)) and concluded that Carter was non-compliant

with medical therapy and had died as a direct result of a seizure.  (Doc. 18-

4, Assurant Letter dated 4/15/13 at 2).

As part of the first appeal, Michael D. Bell, M.D., a pathologist

engaged by the defendant, reviewed the case, including Dr. Parmet's

findings.  He found that Carter's drowning was "the direct result of his

untreated seizure disorder."  (Doc. 18-3, Dr. Bell Report dated 1/22/13 at

204-06).

On March 12, 2013, while the final appeal was pending, plaintiff's

counsel provided to defendant a follow-up report from Dr. Ross, whom

plaintiff had asked to clarify his previous findings.  (Doc. 18-3, Dr. Ross

Letter dated 2/21/13 at 222).  Dr. Ross reported having reviewed

documents sent by plaintiff's counsel, and stated:

> It is my opinion based on this information that Corey Carter
> died as a result of drowning and that his manner of death was
> accidental.  There is no evidence, by witness or anatomic
> finding, other than history and the circumstantial evidence
> surrounding his death that a seizure in fact occurred.
> I do however believe due to:
>     1. His history of seizures
>     2. Lack of anti-seizure medication in the postmortem blood
>     sample
>     3. The presence of ethanol in his postmortem blood which is
>     well known to induce seizures
>     4. Lack of trauma to the body, head or spinal column
>     5. Lack of significant cardiovascular disease

that Mr. Carter died as a result of drowning induced by a
seizure.

(Id. at 223-224).  Dr. Ross further found no basis to assume Carter would

have died of a seizure had he not drowned in a bathtub.  Therefore, Dr.

Ross considered the manner of death "accidental and not natural."  (Id.)

The parties dispute some aspects of Carter's medical history, but

agree that Carter had received treatment in the past for seizures.  At one

time Carter was prescribed Dilantin for his seizures, but no prescriptions

were in effect for a significant time period before Carter's death, and post-

mortem testing confirmed that neither Dilantin nor any other anti-seizure

medication was present in his body.  (Doc. 17, Pl.'s Br. at 2).  Additionally,

Carter had not treated with his neurologist since 2005.  (Doc. 18-3,

Assurance Denial Letter dated 10/23/12 at 146).  Plaintiff Ryta

Chanthavong, Carter's companion of fourteen years and current guardian

of D.D.C., recalls only one seizure in that entire period, in 2011.  (Doc. 17,

Pl.'s Br. at 2).  Thus, plaintiffs characterize Carter's condition as having

had seizures in the past, but as they had abated for a substantial number

of years, he did not continue treatment, while the defendant asserts that

Carter suffered from an active, untreated, and unmedicated seizure disorder.

### D. Procedural Posture

Plaintiffs filed the instant action on October 29, 2013, seeking relief under section 1132(a)(1)(B) of ERISA, and under Pennsylvania state law for breach of contract[3].  (Doc. 1, Compl.).  After discovery, the parties filed cross motions for summary judgment presently before the court.  (Docs. 16, 18).  The parties then briefed the issues, bringing the case to its present posture.

### Jurisdiction

As plaintiff brings suit under ERISA, the court has federal question jurisdiction.  See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  The court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).  ("[I]n any

---

[3]  Though the parties have not briefed the question, the court will not address plaintiffs' state law breach of contract claim, because it is preempted by ERISA.  See CardioNet, Inc. v. Cigna Health Corp., 751 F.3d 165, 177 (3d Cir. 2014) (citing Pryzbowski v. U.S. Healthcare, Inc., 245 F.3d 266, 278 (3d Cir. 2001) (holding suits against insurance companies for denial of benefits are preempted by ERISA, "even when the claim is couched in terms of common law negligence and breach of contract").

civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").  As noted above, pursuant to the plain language of the policy, the court will analyze the policy in accordance with Pennsylvania law.

**Standard of Review**

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n. 4 (3d Cir.1997) (citing Fed. R. Civ. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  Anderson, 477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial.  Id. at 324.

The standard of review for an action brought under section 1132(a)(1)(B) of ERISA is not set forth in the statute.  The United States Supreme Court has held that courts should ordinarily apply a *de novo*

10

standard of review in assessing a plan administrator's denial of ERISA

benefits.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

However, if the ERISA plan gives the administrator or fiduciary

discretionary authority to make eligibility determinations, we review its

decisions under an abuse-of-discretion (or arbitrary and capricious)

standard.[4]  Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008); Doroshow v.

Hartford Life & Accident Ins. Co., 574 F.3d 230, 233 (3d Cir. 2009);  Estate

of Schwing v. The Lily Health Plan, 562 F.3d 522, 525 (3d Cir. 2009).

Under the abuse of discretion standard we may overturn a decision only if

it is "without reason, unsupported by substantial evidence or erroneous as

a matter of law."  Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir.

2011) (quoting Abnathya v. Hoffmann–La Roche, Inc., 2 F.3d 40, 45 (3d

Cir.1993)).

    The Supreme Court has held that, where an insurance company

"both determines whether an employee is eligible for benefits and pays

benefits out of its own pocket . . . this dual role creates a conflict of

interest."  Glenn, 554 U.S. at 108.  A court reviewing a denial of benefits by

---

[4] In the ERISA context, an "abuse-of-discretion" standard of review is used interchangeably with an "arbitrary and capricious" standard of review. Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 n.6 (3d Cir. 2010).

such a company should consider the conflict as a factor in determining

whether the denial of benefits was an abuse of discretion, and the

significance of that factor will depend upon the circumstances of the

particular case.  Id. citing Firestone, 489 U.S. at 115.  The Court explained

that the existence of this conflict of interest does not automatically convert

the abuse of discretion standard to a *de novo* review, but that a reviewing

court should still apply the deferential standard of review, while taking into

account the conflict in determining whether the insurance company has

abused its discretion.  Glenn, 554 U.S. at 115.

In the instant case, we apply the arbitrary and capricious standard of

review because the plan administrator, the defendant, has discretion to

interpret the terms of the policy and to determine eligibility for and

entitlement to plan benefits.  (See Doc. 18-3, Group Insurance Policy at 39

("We have the sole discretionary authority to determine eligibility for

participation or benefits and to interpret the terms of the Policy."))  In

addition, the defendant insurance company both made the determination

as to eligibility and would pay the claim if it was deemed payable.

Therefore, the defendant's conflict of interest will be considered as a factor

in reviewing defendant's denial of accidental death benefits.

12

**Discussion**

Defendant argues that substantial evidence establishes that a seizure caused Cory Carter to drown, which invoked the policy's physical disease exclusion, thereby precluding payment of the accidental death benefit.  Plaintiffs disagree, arguing that if there was a seizure, it merely began a chain of events that led to Carter's death.  Plaintiffs urge the court to find that a seizure did not cause Carter's death, directly or indirectly, and therefore defendant's denial of benefits was improper.

The parties do agree that Cory Carter drowned.  His life ended because his heart stopped, and his heart stopped because he could not breathe, and he could not breathe because his lungs were full of water. This much is not in dispute.  Defendant relies heavily on the expert opinions of doctors and pathologists who reviewed the medical evidence and concluded that a seizure likely led to the drowning.  But as defendant acknowledges with respect to Dr. Ross (see Doc. 19, Def.'s Br. at 6), the doctors and pathologists who have opined on Corey Carter's death have done so in a purely factual context, and not a legal one.  The court notes, in fact, that no evidence appears in the record to demonstrate that

13

defendant made any attempt to interpret Pennsylvania law in relation to the policy at any time during the process of reviewing the claim.

According to the plain language of the policy, the defendant has the sole discretion to interpret and apply the policy terms.  Defendant argues that it based its determination of the circumstances of Carter's death upon substantial evidence, and therefore did not abuse its discretion. Regardless of defendant's determination of the facts, defendant erred in interpreting Pennsylvania law.

In briefing on these motions, defendant relies on a number of cases from other circuits, none of which interpret Pennsylvania law.

The only Third Circuit case the defendant cites to–indeed, relies heavily on–in support of its denial of benefits is Shiffler v. Equitable Life Assurance Society of the United States, 838 F.2d 78 (3d Cir. 1988). Shiffler does apply Pennsylvania law, but the case is factually inapposite.

In Shiffler, the decedent, who suffered from heart disease, died of a heart attack.  The insurance policy in that case provided that accidental death "[b]enefits are paid provided that the . . . death is not caused directly or indirectly by disease. . . ."  Id. at 84.  The court interpreted this language to mean that the claimant's widow could recover "only if pre-existing

14

disease did not *contribute* to Mr. Shiffler's death."  Id.  The defendant

insurance company demonstrated that Shiffler's death was caused at least

in part by his pre-existing heart disease.  Id. at 85.  The court held that the

existing heart disease contributed to the heart attack, and precluded

recovery.[5]  Id.

Shiffler's holding is that where a physical disease causes the death

of the claimant, the exclusionary language regarding "physical disease" is

triggered.  Defendant would extend this holding to encompass any

accidental death where the insured's disease came into play at any point,

whether it actually caused death or not.  The court disagrees.  Shiffler is

not applicable more broadly to the entire chain of events leading up to the

death, no matter how defendants attempt to stretch or alter the language of

the holding.[6]

---

[5]  The court did not decide the question of whether Shiffler's death was actually an "accident" under the policy, but expressed doubt that it could have found it was, even absent a pre-existing heart disease.  Shiffler, 838 F.2d at 85 n.9.

[6] In its answer, defendant quotes Shiffler as follows: "there can be no recovery if pre-existing disease contributed to the [loss]."  (Doc. 4 at 5).  The Third Circuit, however, wrote, "there can be no recovery if pre-existing disease contributed to the **death**."  838 F.2d at 84 (emphasis added).

15

Thus, Shiffler is informative in the present case, but only up to a point.  In Shiffler, the pre-existing disease actually contributed to the claimant's death; the heart disease caused the heart attack, which killed Shiffler.  That is clearly not the case with respect to the death of Cory Carter.  If the events unfolded as defendant posits they did, Carter would not have drowned but for a seizure.  But, even so, the seizure did not kill him.  Carter died because water filled his lungs, causing him to be unable to breathe, which brought on cardiac arrest.  Any seizure Carter may have had did nothing to contribute to any of these factors.  A seizure may have set in motion the chain of events that led to Carter being in a particular position or location, but the seizure did not stop his breath or heart.

More on point is the opinion in Liberty Life Insurance Co. v. Figueroa, cited by plaintiffs.   In Figueroa, the Third Circuit Court of Appeals reviewed an insurance company's denial of an accidental death claim, where the insurance company argued that recovery was precluded under a disease exclusion similar to the one in this case.  461 F. App'x 173 (3d Cir. 2012). In Figueroa, the claimant died from an allergic reaction to contrast dye injected into his bloodstream for a CT scan.  The CT scan had been

ordered in response to the claimant's complaints of abdominal pain, nausea, and vomiting. Id. at 174.

The defendant, Liberty Life, focused on evidence that the claimant suffered from a gastrointestinal illness caused by diverticula and argued that the illness contributed to the claimant's death. Id. at 177. The Third Circuit, interpreting Pennsylvania law, held that the claimant's death did not fall within the policy's exclusion for death resulting directly or indirectly, in whole or in part, from disease, illness, or infirmity of the body or mind. Id. at 177 (citing Speer v. W. & S. Life Ins. Co., 43 A.2d 562, 566 (Pa. Super. Ct. 1945) (holding that because it was an admitted fact that the insured's death was due solely to a skull fracture from falling on a concrete floor, "death could not have been due, even partially, to a preexisting disease or infirmity"). The Figueroa court found that the gastrointestinal illness could not have contributed to the claimant's death, because the cause of death was anaphylaxis. Id. In so holding, the court rejected the defendant's argument that because the physical disease "precipitated the chain of events" that led to the claimant being injected with the dye that caused the anaphylaxis, the disease caused or contributed to his death. Id. at 178.

17

The parallel to the present case is clear, and conclusive.  The court is persuaded by the Third Circuit's interpretation of Pennsylvania law, which is the governing authority under the policy in this case as well.  A gastrointestinal disease caused Figueroa to find himself injected with dye for a CT scan, but the dye (and not the disease) caused the allergic reaction that caused his death.  Likewise, a seizure may have caused Cory Carter to find himself in the bathtub, but the water in his lungs (and not a seizure) caused the respiratory failure that brought about cardiac arrest, and ultimately his death.  A seizure may have "precipitated the chain of events," as in Figueroa, but it did not cause or contribute to Carter's **death**, as did the heart disease in Shiffler.

Defendant further cites to a handful of District Court cases from the Third Circuit, none of which alter our conclusion.  Ray v. Federal Insurance Company is factually distinguishable in the same manner as Shiffler.  No. 05-2507, 2007 WL 1377645 (E.D. Pa. May 10, 2007).  The disability at issue in Ray was found to have been directly caused by a degenerative medical condition, and did not merely begin a chain of events that led to the disability.  Id. at *1; see also Erbe v. Conn. Gen. Life Ins. Co., 695 F. Supp. 2d 232 (W.D. Pa. 2010) (Heart disease caused fatal heart attack.);

18

Rodia v. Metro. Life Ins. Co., 354 Pa. 313, 315 (1946) (holding that where the cause of death was "heart trouble," the decedent's heart condition contributed to the death).  Other cases do apply Shiffler to a set of facts involving a chain of events set in motion by a physical disease to uphold a denial of accidental death benefits, without mention of Figueroa.  See Kitsock v. Balt. Life Ins. Co.,No. 3:12-cv-01728, 2014 WL 65302 (M.D. Pa. Jan. 8, 2014); Nally v. Life Ins. Corp. of N. Am., No. 07-0707, 2007 WL 4390423 (E.D. Pa. Dec. 14, 2007).  These cases are not binding on this court, and, to the extent these decisions conflict with Figueroa, we find them unpersuasive.  Instead, we will follow the Third Circuit's application of Pennsylvania law.

Therefore, we hold that defendant's interpretation of the policy was erroneous as a matter of law.  The physical disease exclusion does not apply, and plaintiffs' claim to the accidental death benefit should not have been denied.  Accordingly, the court will deny defendant's motion and grant summary judgment in favor of the plaintiffs.

**Disputed Issues of Material Fact**

While the court previously determined that defendant's interpretation of the policy was erroneous as a matter of law, the court will briefly discuss

19

an issue regarding the facts of this case.  Despite the parties assertions

that no genuine issues of material fact remain, a dispute nonetheless

lingers over the interpretation of those facts and whether sufficient

evidence existed for the defendant to conclude that Carter had a seizure

prior to drowning.  Plaintiffs point to statements by Ryta Chanthavong and

Bonnie Carter, Cory Carter's mother, that Carter had had only one seizure

in the fourteen years prior to his death, and to Dr. Ross's statement that no

direct evidence of a seizure exists.  Supporting these statements, argue

plaintiffs, are the absence of anti-seizure medication in Carter's blood and

the fact that Carter had not seen a doctor in some years.  Plaintiffs urge

that these facts demonstrate that Carter had not suffered from a seizure

disorder for years.  Plaintiffs argue that the evidence demonstrates it was

unlikely that a seizure occurred.

Defendant construes the same facts as evidence that Carter was

noncompliant with his medical therapy[7] and his seizure disorder was

therefore uncontrolled, making the occurrence of a seizure more likely.

---

[7]  The court can find in the record no evidence of any therapy
regimen prescribed for Carter at the time of his death.  The parties agree
Carter at one time took Dilantin, but neither presents any records of any
prescriptions for medication or any other type of treatment in effect at the
time of his death, and no indication as to the reason he stopped taking the
drug.

20

Further, defendant concedes that "the parties in this case are not in agreement as to the sole cause of Mr. Carter's death."  (Def.'s Reply, Doc. 29 at 5).  While the court notes that this dispute exists, and that we would otherwise deny both parties' motions for summary judgment based on this dispute, the court need not put the question to a jury at this time, as, for the reasons explained above, our holding rests on other grounds and renders the issue moot.

**Conclusion**

For the reasons stated above, we conclude that defendant's denial of the plaintiffs' claim was erroneous as a matter of law.  (See Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011) (quoting Abnathya v. Hoffmann–La Roche, Inc., 2 F.3d 40, 45 (3d Cir.1993)) (Under the abuse of discretion standard we may overturn a decision only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law.").  Therefore, the plaintiffs' claim for the accidental death benefit under the policy is valid.  Defendant's motion for summary judgment will be denied, and plaintiff's motion for summary judgment will be granted. Defendant will be ordered to pay to D.D.C. the $100,000 benefit, plus interest from May 14, 2012.   An appropriate order follows.

21

Date:<u>11/4/2014</u>                                    <u>s/James M. Munley</u>
                                                       **JUDGE JAMES M. MUNLEY**
                                                       **United States District Cour**t